# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JADE SCHILLY DAUTERIVE, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-3067** |
| **SERGEANT JOSEPH MARCAL, ET AL.** | **SECTION: "P" (4)** |

## <u>ORDER AND REASONS</u>

This action, brought under 42 U.S.C. § 1983 and Louisiana law, arises out of the tragic death of 65-year-old Anne Schilly, on September 1, 2021.[1] Plaintiffs, Jade Schilly Dauterive and Tylere Schilly,[2] are her surviving adult children. Plaintiffs contend their mother, who suffered from mental illness, was in the midst of a mental health crisis when she was confronted by Jefferson Parish Sheriff Sergeant Joseph Marcal and Deputy Brian Khars, after Schilly was accused of harassing and threatening some Jefferson Parish utility workers who were repairing a water main in the aftermath of Hurricane Ida.[3] This fateful encounter ended in Schilly's death after she was shot by Deputy Khars.

Pending before the Court is a motion for summary judgment filed by Defendants, Marcal and Khars, in their individual capacities, and Joseph P. Lopinto, III, in his official capacity as the Sheriff of Jefferson Parish.[4] Plaintiffs opposed the motion,[5] and Defendants filed a reply,[6] and Plaintiffs and Defendants thereafter filed supplemental memoranda.[7] Having considered Defendants' motion and the extensive briefing and other materials filed in connection with the motion, along with the applicable law, the Court **GRANTS** Defendants' Motion.

---

[1] R. Doc. 1.
[2] Jade Schilly Dauterive is suing in both her individual capacity and as Independent Executrix of the Succession of Anne Schilly. R. Doc. 1.
[3] *Id*. at ¶ 6.
[4] R. Doc. 34.
[5] R. Doc. 38.
[6] R. Doc. 39.
[7] R. Docs. 41, 46.

## I.    BACKGROUND

On September 1, 2021, Sergeant Joseph Marcal, a twenty-year-veteran of the Jefferson Parish Sheriff's Department, who served as a member of the SWAT team[8] and as a firing instructor at the department's training academy,[9] was providing extra help in the days immediately after Hurricane Ida struck South Louisiana.[10]    While driving westbound on Park Manor Drive in Metairie,[11] with the police lights on his unmarked Ford Explorer flashing to remind motorists to slow down because the area's traffic signals were not working,[12] Sergeant Marcal was "flagged down" by two Jefferson Parish utility workers.[13] One of the workers told Sergeant Marcal that a woman had made racial slurs toward him and had threatened to kill him and possibly other people in his vicinity.[14]

The worker pointed to a woman, who would later be identified as Schilly, sitting in a dark-colored sports utility vehicle.[15] Sergeant Marcal broadcast the woman's description over his police radio and requested assistance.[16] The dispatcher reported that 911 had already been called in reference to an irate woman who was threatening parish workers.[17]

Meanwhile, Deputy Brian Khars, a six-and-a-half-year veteran of the department's Fourth District, who had previously served for a little over four years as a patrol officer with the police department in Kenner, Louisiana,[18] had been dispatched to a call, arising out of a driver blocking

---

[8] R. Doc. 34-6 at 24.
[9] R. Doc. 34-4 at 6.
[10] R. Doc. 34-4 at 24.
[11] R. Doc. 34-4 at 30.
[12] R. Doc. 34-4 at 35.
[13] R. Doc. 34-4 at 30.
[14] R. Doc. 34-4 at 37-38.
[15] R. Doc. 34-4 at 38.
[16] R. Doc. 34-4 at 41.
[17] R. Doc. 34-4 at 41.
[18] R. Doc. 34-5 at 10

the roadway and yelling obscenities, in the 6500 block of Park Manor Drive.[19] He advised dispatch that he was en route,[20] and when he arrived, he saw Sergeant Marcal and "a bunch of people on the sidewalk and in the street," and a dark SUV blocking the roadway.[21]

Sergeant Marcal, dressed in plain clothes,[22] had gone to the front of Schilly's vehicle, with his Jefferson Parish Sheriff's ID in hand.[23] Marcal testified that he looked directly at Schilly, so he could communicate with her,[24] and he greeted her "in a calm, very collected voice."[25] He told her he was Sergeant Marcal with the sheriff's department, and that he was "[j]ust trying to talk to her."[26] Schilly "cracked [her window] a little bit," and said "f*ck you" to Sergeant Marcal and called him a "piece of sh*t."[27] As Marcal continued to try and talk to Schilly, she cursed him and indicated she did not want to speak with him.[28] Marcal, who had left his weapon in his police unit,[29] was standing on the driver's side of Schilly's vehicle, near its A-pillar with the driver's side mirror near his abdomen.[30]

Meanwhile, Khars, who arrived in a marked police unit[31] and wearing his full uniform,[32] noticed Schilly's car window was half up and half down, and she was flailing her arms.[33] Khars said he walked up to Schilly's car and introduced himself, saying, "Hello, I'm Deputy Brian Khars," and asked Schilly how she was doing and what was happening.[34] Khars testified Schilly

---

[19] R. Doc. 34-5 at 24.
[20] R. Doc. 34-5 at 25.
[21] R. Doc. 34-5 at 26.
[22] R. Doc. 34-4 at 26.
[23] R. Doc. 34-4 at 43.
[24] R. Doc. 34-4 at 42-43.
[25] R. Doc. 34-4 at 43.
[26] R. Doc. 34-4 at 43.
[27] R. Doc. 34-4 at 43.
[28] R. Doc. 34-4 at 44.
[29] R. Doc. 34-4 at 44.
[30] R. Doc. 34-4 at 49.
[31] R. Doc. 34-5 at 36.
[32] R. Doc. 34-5 at 35.
[33] R. Doc. 34-5 at 27.
[34] R. Doc. 34-5 at 31.

was yelling in a loud voice, using obscenities, and was making racial slurs regarding the workers who were nearby.[35] Schilly did not cooperate with Khars' request to see her driver's license, and instead rolled up her window and yelled at him.[36]

The testimony of the defendant officers differs somewhat over exactly what else happened at the initial scene. Khars, who had received crisis intervention training to deal with the mentally ill,[37] had dealt with a lot of mentally ill persons as a law enforcement officer.[38] Khars believed, based on his training and experience, that Schilly had some kind of mental health issue.[39] He testified that he and Marcal decided they "were going to 2853L her,"[40] which is when a law officer makes a determination that a person is "a danger to [herself], a danger to others, or gravely disabled," and the person needs to be evaluated by a medical professional.[41]

The officers' plan, according to Khars, was to attempt to get Schilly to open the window again, and Marcal would reach inside Schilly's car and unlock her door, while Khars would grab the door handle and open the door,[42] and the officers would take her out of the car and bring her to a hospital.[43] Khars testified that when they knocked on Schilly's car to get her to open the window, she gave them "the middle finger" and "the mouth movement of the F word."[44]

---

[35] R. Doc. 34-5 at 33.
[36] R. Doc. 34-5 at 34.
[37] R. Doc. 34-5 at 16.
[38] R. Doc. 34-5 at 18.
[39] R. Doc. 34-5 at 37.
[40] La. R.S. 28:53 provides, generally, that a person suffering from mental illness may be admitted, on an emergency basis, to a treatment facility for observation, diagnosis, and treatment. At subpart L(1), the statute provides that a law enforcement officer may take a person into protective custody and transport the person to a treatment facility for a medical evaluation "when, as a result of his personal observation, the peace officer . . . has reasonable grounds to believe the person is a proper subject for involuntary admission to a treatment facility because the person is acting in a manner dangerous to himself or dangerous to others, is gravely disabled, and is in need of immediate hospitalization to protect such a person or others from physical harm."
[41] R. Doc. 34-5 at 37.
[42] R. Doc. 34-5 at 36.
[43] R. Doc. 34-5 at 38.
[44] R. Doc. 34-5 at 39.

Marcal, too, had received training in dealing with the mentally ill.[45] He testified that the goal when dealing with a mentally ill person is to get them help by bringing them to a medical facility for treatment.[46] Unlike Khars, however, he did not make an initial assumption about Schilly's mental health. He was interested in "trying to figure out a way to deal with the situation."[47] Marcal, contrary to Khars' testimony, testified he "was the one talking" because he had "already established a rapport with Ms. Schilly."[48] Marcal said he and Khars had talked and "formulated an opinion about what may be the best course of action," which Marcal said was to "get her out of the vehicle and just interview her."[49] Marcal was trying to understand whether he was dealing with someone to whom the Louisiana protective custody and transport statute[50] applied, or if this was "going to be just a person who got upset and said some things probably she shouldn't have said."[51] Marcal explained, referring to the immediate aftermath of Hurricane Ida, that it was "a situation of distress," and he was aware that "people are upset" and are "not in their normal state" in this kind of situation, and he "did not want to make an assumption."[52]

According to Khars, as the officers were trying to get Schilly to open the window, "her vehicle started to idle forward."[53] Khars said that while he was standing on the driver's side of the vehicle, and Marcal was standing at "the front driver's side fender,"[54] Schilly "took her foot off the brake, and her vehicle started to roll forward."[55] Schilly rolled for 15 to 20 feet, according to

---

[45] R. Doc. 34-4 at 16-17.
[46] R. Doc. 34-4 at 18.
[47] R. Doc. 34-4 at 45.
[48] R. Doc. 34-4 at 45.
[49] R. Doc. 34-4 at 49.
[50] *See supra* note 40.
[51] R. Doc. 34-4 at 49.
[52] R. Doc. 34-4 at 50.
[53] R. Doc. 34-5 at 39.
[54] R. Doc. 34-5 at 39.
[55] R. Doc. 35-5 at 39.

Khars, and then "hit[] the gas."[56] As Schilly's vehicle began rolling, Khars told Schilly to stop the vehicle,[57] and he saw Marcal hitting Schilly's windshield with his hand, asking her to stop.[58] Instead, Schilly took off at a high rate of speed.[59] Marcal, according to Khars, was "clipped" by Schilly's car, and while he did not fall, he spun, caught his balance, and then ran back to his unmarked unit to pursue Schilly.[60] Meanwhile, Khars, who did not draw his weapon at any point at the initial scene,[61] ran to his own marked police unit to pursue Schilly.[62]

Marcal described the last few moments at the initial scene a little differently. He testified that Schilly "somehow put the vehicle in drive, unless her foot was already on the brake," which he admitted he did not know, and then turned the vehicle to her left, pushing it into Marcal, who "just held on as she dragged [him] down the street," causing Marcal's feet to get "sucked underneath the vehicle."[63] Marcal said Schilly's vehicle "accelerated really fast," and made contact with his abdomen, dragging him "about maybe 15, 20 feet," as he was "trying to push away from it."[64] He could not see Khars because he was busy trying not to get "sucked underneath the vehicle and rolled over," and was yelling "Please stop, please stop."[65] Marcal was eventually able to push off Schilly's vehicle, backpedal, and regain his balance, and he could then see Khars "following her" in "a fully marked JPSO unit, lights and sirens, everything on it," while he got into his own unit to assist.[66] A cell phone video recording made by one of the utility workers captured Ms. Schilly cursing and making racial slurs toward the worker and some of her interaction with the

---

[56] R. Doc. 34-5 at 40.
[57] R. Doc. 34-5 at 45-46.
[58] R. Doc. 34-5 at 46.
[59] R. Doc. 34-5 at 47.
[60] R. Doc. 34-5 at 47-48.
[61] R. Doc. 34-5 at 40.
[62] R. Doc. 34-5 at 49.
[63] R. Doc. 34-4 at 52.
[64] R. Doc. 34-4 at 53.
[65] R. Doc. 34-4 at 54.
[66] R. Doc. 34-4 at 56-57.

officers on Park Manor, including after she accelerated with Sergeant Marcal holding onto and then pushing off her moving vehicle, as well as the officers' initial pursuit of Schilly from the scene on Park Manor Drive.[67]

Marcal described Khars' action upon leaving the initial Park Manor Drive scene, as "following," not chasing,[68] and Marcal could not say how fast Schilly was going because they were initially too far ahead of him.[69] The video evidence, however, shows Schilly and the police vehicles leaving the initial scene at a high rate of speed.[70] Even at this point, while Marcal was "concerned for her state of mind," he testified he could not evaluate her mental health because "[s]he wouldn't get out of the car."[71] Marcal's "plan was to try to assist Deputy Khars in the best way possible and the safest way possible," to help "get her whatever help she needed," but "more importantly," Marcal said, he "was concerned for the safety of the public, given that she had just dragged [him] down the street."[72]

Meanwhile, Khars notified headquarters that Schilly's vehicle had taken off, and they were in a vehicle pursuit.[73] Khars pursued Schilly down Park Manor Drive onto northbound Downs Boulevard, and then westward onto Veterans Boulevard.[74] Khars did not lose sight of Schilly's vehicle, as he pursued her with lights and sirens, and as Marcal pursued with flashing lights.[75] At first, Khars was the lead police unit,[76] but when the vehicles moved to Veterans Boulevard, Marcal pulled ahead of both Schilly and Khars.[77] Eventually, Schilly reached Lisa Drive where "a bunch

---

[67] R. Doc. 34-6.
[68] R. Doc. 34-4 at 57.
[69] R. Doc. 34-4 at 57.
[70] R. Doc. 34-6.
[71] R. Doc. 34-4 at 57-58.
[72] R. Doc. 34-4 at 58.
[73] R. Doc. 34-5 at 51-52.
[74] R. Doc. 34-5 at 52.
[75] R. Doc. 34-5 at 53.
[76] R. Doc. 34-5 at 54.
[77] R. Doc. 34-5 at 55.

of vehicles were stopped."[78] Khars estimated the pursuit reached speeds of up to 50 miles per hour on Veterans Boulevard, where the speed limit was 35 or 40 miles per hour depending on the location, and Khars believes Schilly "[weaved] in and out of the middle to right lane."[79] Khars testified he continued his pursuit of Schilly because he was concerned she could endanger other drivers.[80]

Schilly stopped when the vehicle in front of her stopped for traffic.[81] Khars exited his vehicle and went toward Schilly's driver's side door, while asking Schilly to stop the vehicle.[82] Marcal testified he had driven ahead of the car that had stopped in front of Schilly because of a nonfunctioning traffic signal. Marcal parked in front of this vehicle, while Khars parked directly behind Schilly. Marcal's goal would have been to "box her in,"[83] to prevent her from driving off, with Khars' unit directly behind Schilly, and his unit directly in front of Schilly, but he was unable to do this because the other car had stopped immediately ahead of Schilly.[84] Marcal ran from his unit to the front of Schilly's car,[85] and Khars could see him in front of Schilly's vehicle.[86]

Khars said he drew his weapon because he "was concerned about [Marcal's] safety, of [Marcal] receiving a great bodily harm, or getting killed and run over by [Schilly's] vehicle."[87] Khars did not get in front of Schilly's vehicle because Marcal was already in front, and Jefferson Parish officers are taught to use a Tactical-L formation to avoid an officer-on-officer shooting.[88]

---

[78] R. Doc. 34-5 at 55.
[79] R. Doc. 34-5 at 57.
[80] R. Doc. 35-4 at 61.
[81] R. Doc. 34-5 at 61-63.
[82] R. Doc. 34-5 at 63.
[83] R. Doc. 34-4 at 60.
[84] R. Doc 34-4 at 60-61.
[85] R. Doc. 34-4 at 61.
[86] R. Doc. 34-5 at 64.
[87] R. Doc. 34-5 at 68.
[88] R. Doc. 34-5 at 68-69.

When Khars drew his weapon, he was about 10 feet away from Schilly's car, and he yelled for her to stop and get out of her car.[89] Meanwhile, Marcal could see Khars had his weapon pointed directly at Schilly.[90] At this point, Marcal was standing "[i]n the front of the vehicle, on the driver's side, looking directly at her through the window,"[91] and he made eye contact with Schilly and asked her to "Stop, stop. Please, stop."[92] Marcal said he was positioned with part of his body in front of her car and part of his body on the side, at the corner of the driver's side front bumper, "in a more advantageous position to push off."[93] Marcal explained this was not really an "advantageous position," but he thought it was the only position from which he could maintain effective communication with Schilly.[94] He testified he would not put himself directly in the front center of Schilly's vehicle, however, because he did not want "to get run over" or "pinned between" Schilly's car and the car in front of it.[95] He chose this position in case Schilly "pulled something like before," so he could "be safe, within reason" because "a car can accelerate very rapidly," and it can be "very difficult to sometimes get out of the way."[96]

Marcal testified that, as this was unfolding, Schilly was staring straight ahead, and was not "even really looking" at Marcal, when "[t]he engine revved up, and the car lurched forward."[97] Khars testified that "fairly quickly"[98] after he yelled at Schilly to stop and get out of her vehicle, it appeared to him that Schilly had taken her foot off the brake and, based on what he had seen on Park Manor, he thought she was "about to go accelerate."[99] Marcal, who did not remember Khars

---

[89] R. Doc. 34-5 at 70-71.
[90] R. Doc. 34-4 at 63.
[91] R. Doc. 34-4 at 65-66.
[92] R. Doc. 34-4 at 65.
[93] R. Doc. 34-4 at 66-68.
[94] R. Doc. 34-4 at 69.
[95] R. Doc. 34-4 at 70.
[96] R. Doc. 34-4 at 70.
[97] R. Doc. 34-4 at 72.
[98] R. Doc. 34-5 at 73.
[99] R. Doc. 34-5 at 74.

saying anything to Schilly,[100] described the sound as "kind of strange," and "almost like it was – like, a racecar,"[101] and he attempted to push off, and although the vehicle hit his left leg when the vehicle lurched forward, he was ultimately not injured.[102] Marcal yelled at Schilly to stop, and then he very quickly heard gunshots.[103]

Khars fired eight Glock 9 millimeter rounds though Schilly's driver's side door and window, in rapid succession.[104] When Khars saw, through the shattered window of her car, that Schilly had been shot in the neck, he holstered his weapon.[105] Khars testified that while he had drawn his weapon many times while working as a law enforcement officer, this was the first time he had ever fired his weapon while on duty, other than at practice on the firing range.[106]

On August 31, 2022, Plaintiffs brought this civil action, asserting the following causes of action: (1) excessive force and failure to intervene under § 1983 against Marcal and Khars; (2) *respondeat superior* claims against Sheriff Lopinto; and (3) Louisiana state law battery, negligence, wrongful death, and survival action claims against Marcal, Khars, and Lopinto.

## II.    THE  PRESENT MOTION

Defendants seek summary judgment under Rule 56 of the Federal Rules of Civil Procedure on grounds that Plaintiffs have failed to show that: (1) any Defendant deprived Anne Schilly of her right to be free from excessive force, (2) any Defendant violated Anne Schilly's rights by failing to intervene to prevent Khar's alleged use of excessive force, (3) Sheriff Lopinto had a

---

[100] R. Doc. 34-4 at 71.
[101] R. Doc. 34-4 at 72.
[102] R. Doc. 34-4 at 73.
[103] R. Doc. 34-4 at 72-73.
[104] R. Doc. 34-5 at 76-78.
[105] R. Doc. 34-5 at 78-79.
[106] R. Doc. 34-5 at 19.

policy or practice of violating civil rights, or (4) any Defendant committed a battery or was otherwise liable under Louisiana state law.[107]

Plaintiffs argue Defendants have failed to carry their threshold burden of demonstrating the absence of a dispute of fact when viewing the facts in the light most favorable to Plaintiffs because, they contend, Defendants' motion avoids the adverse facts in the record which Plaintiffs contend are fatal to summary judgment on the reasonableness of Deputy Khars' decision to shoot Schilly. Similarly, Plaintiffs argue that notwithstanding Defendants' contention that Marcal was in no position to know that Khars would shoot Schilly and, therefore, could not intervene, Marcal should have intervened and reoriented Khars to determine whether Schilly was suffering from a mental health crisis. Plaintiffs also maintain that Marcal and Khars are not entitled to qualified immunity because, under the relevant legal test, the officers violated a clearly established constitutional right at the time of this incident. Plaintiffs concede, however, there is "no evidence linking Sheriff Lopinto to the incidents in this case."[108] Plaintiffs also agree there is no evidence in the record "as to any policy or practice that would establish liability as a *Monell* claim,"[109] and Plaintiffs concede the Court should grant Defendants' motion regarding the claims against Sheriff Lopinto. Finally, Plaintiffs contend their state law claims should not be dismissed because there are material issues of fact regarding whether Defendants used excessive force.

---

[107] R. Doc. 34-1 at 1.
[108] R. Doc. 38 at 18.
[109] R. Doc. 38 at 18.

## III.    RELEVANT LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is proper when "there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law."[110] A federal court must view the facts in the light most favorable to the nonmovant.[111] Initially, the movant bears the burden of showing the absence of a genuine issue as to any material fact,[112] but the burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial.[113] A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the applicable law in the case.[114] A dispute about a material fact is "genuine" if it is one upon which a reasonable jury could return a verdict for the nonmoving party based upon the jury's resolution of the particular factual issue.[115] "When assessing whether a dispute as to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[116]

### B.  Qualified Immunity

Qualified immunity protects government officials from liability for damages when they violate the law, but reasonably could have believed they were acting lawfully.[117] The qualified immunity defense "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

---

[110] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).
[111] *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).
[112] *Celotex*, 477 U.S. at 323.
[113] *See* FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).
[114] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[115] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993).
[116] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (first citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and then citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
[117] *Ramirez v. Killian,* 113 F.4th 415, 421 (5th Cir. 2024).

distraction, and liability when they perform their duties reasonably."[118] A plaintiff can defeat a qualified immunity defense by showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[119] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[120] When a defendant official moves for summary judgment on the basis of qualified immunity, the burden shifts to the plaintiff, who must rebut the defense by establishing a genuine issue of fact as to whether the official's allegedly wrongful conduct violated clearly established law.[121]

## IV. LAW AND ANALYSIS

### A. Excessive Force Claim & Qualified Immunity

The Court will first address Plaintiffs' § 1983 claims against Marcal and Khars for the alleged deprivation of their mother's Fourth Amendment right against unreasonable seizure, which they assert in the form of an excessive force claim. To establish a violation of the Fourth Amendment based on the use of excessive force, Plaintiffs must show an injury that resulted directly from a use of force that was clearly excessive, and that the excessiveness was clearly unreasonable.[122] Defendants argue they are entitled to summary judgment on Plaintiffs' excessive force claims because Plaintiffs cannot show that Defendants' use of force was unreasonable. Defendants separately argue that, even if Plaintiffs can establish a Fourth Amendment violation,

---

[118] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).
[119] *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).
[120] *Pearson*, 555 U.S. at 231.
[121] *Crane v. City of Arlington*, 50 F.4th 453, 461 (5th Cir. 2022) (citations omitted).
[122] *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

Defendants are otherwise entitled to qualified immunity as a matter of law. The Court considers each argument in turn.

### 1. No Fourth Amendment Violation for Use of Excessive Force

Excessive force claims are necessarily fact-intensive, and whether the force used is excessive or unreasonable depends upon the facts and circumstances of each particular case.[123] Here, because Khars used deadly force against Schilly, the injury and causation elements of Plaintiffs' excessive force claim are established, leaving only the excessiveness and reasonableness elements of the equation.[124]

When determining whether an officer's use of force was excessive, federal courts consider the three *Graham* factors, namely: (1) the severity of the suspected crime; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.[125] In cases involving deadly force, the threat-of-harm factor will usually predominate such that the excessive and reasonableness elements become two sides of the same coin.[126] In other words, an officer's use of deadly force is not excessive, and no constitutional violation can occur, when the officer reasonably believes a suspect poses a threat of serious harm to the officer or others.[127]

The Supreme Court has counseled that the reasonableness of "a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that

---

[123] *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[124] *McVae v. Perez*, 120 F.4th 487, 492 (5th Cir. 2024).
[125] *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).
[126] *McVae*, 120 F.4th at 492.
[127] *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[128]   The Supreme Court has also counseled that in evaluating excessive force claims, courts are required to look beyond the moment an officer employs force and should consider how earlier facts and circumstances could affect how a reasonable officer might perceive and respond to later events.[129] In other words, "[t]he history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force."[130]

Turning to the *Graham* factors, the Court will first consider the severity of the crime. Here, the testimony of Khars and Marcal is in conflict about the severity of Schilly's potential criminal conduct. Marcal testified he was not sure what was going on with Schilly. While Marcal could not rule out that she was mentally ill, Marcal was cognizant Schilly had potentially committed several crimes including, possibly, simple assault by threatening the parish workers and battery upon a police officer by striking Marcal with her car.[131] Khars, meanwhile, testified contradictorily to Marcal, saying he did not believe Schilly had committed any crimes.[132] While Khars is likely factually wrong in this regard—because it appears Schilly may have actually committed several crimes—what matters here is Khars' perception, and looking at this conflicting testimony in the light most favorable to Plaintiffs, it is undisputed that the officers who encountered Schilly had not, for example, been informed that she was a violent felon who had a history of violence and possession of firearms.[133] Thus, this factor, when considering the facts in the light most favorable to Plaintiffs, falls in Plaintiffs' favor.

---

[128] *Graham*, 490 U.S. at 396-97.
[129] *Barnes v. Felix*, 605 U.S. 73, 80 (2025).
[130] *Id.* at 80-81.
[131] R. Doc. 34-4 at 58-59.
[132] R. Doc. 34-5 at 60-61.
[133] *Cf. Searles v. City of Houston*, No. H-24-1534, 2025 WL 2294333, at *5 (S.D. Tex. Aug. 8, 2025) ("Randle was a convicted felon who was wanted on three active felony warrants . . . including being a felon in possession of a weapon, and for evading arrest in a motor vehicle . . . the officers involved in pursuing and apprehending Randle knew that he had a history of violence and of illegally possessing firearms.").

The second *Graham* factor is whether the suspect posed an immediate threat to the safety of the officer or others. Again, in cases where the officer uses deadly force, the "threat-of-harm" factor is typically the most critical.[134] Here, when Khars fired the shots that killed Ms. Schilly, he was aware of several critical facts. Just a couple of days after a major hurricane had left large parts of South Louisiana, including the part of Metairie where Khars was patrolling, without critical infrastructure, including functioning traffic lights, Khars had been dispatched to a scene in which an irate woman was threatening parish utility workers who were working on a broken water main. Khars had arrived at the scene in a marked police unit with its lights flashing, while dressed in a police uniform that identified him as a law enforcement officer. He then identified himself as a police officer when he encountered Schilly. He had knocked on her window and had asked her to roll it down, but she had refused and told him "f*ck you." While, based on his testimony, Khars did not necessarily believe he was dealing with a serious criminal, he believed Schilly was undergoing some kind of mental health episode, based upon his training in dealing with the mentally ill. He had just witnessed Schilly roll slowly and then quickly drive off from the initial scene, striking Marcal in the process. With flashing lights and sirens, he had followed Schilly, at speeds in excess of the posted speed limit, while Marcal also followed with flashing lights, on at least three different streets at a time when traffic lights were not functioning properly, presenting a danger to the public. At the final, fateful scene on Veterans Boulevard, Schilly had stopped because traffic ahead of her came to a stop due to a nonfunctioning traffic signal. Marcal, who was unarmed, was facing Schilly's vehicle from the front driver's side,[135] waving his hands, and Khars testified he drew his weapon because he was concerned about Marcal's safety.[136] Specifically, in

---

[134] *McVae v. Perez*, 120 F.4th 487, 492 (5th Cir. 2024); *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021).
[135] R. Doc. 34-5 at 67.
[136] R. Doc. 34-5 at 68.

his own words, he said he was afraid Sergeant Marcal was in danger of "receiving great bodily harm, or getting killed and run over" by Schilly.[137] Khars testified Schilly's vehicle began to move forward "like she took her foot off the brake,"[138] and he thought she was "about to go accelerate,"[139] something he had seen Schilly do just moments earlier at the initial scene. When asked why he shot Ms. Schilly, his response was "[s]he was going forward toward Sergeant Marcal. He was about to receive great bodily harm or be killed by that vehicle."[140]

When addressing the reasonableness of an officer's use of deadly force on the driver of a motor vehicle when perceiving that the motor vehicle poses the threat of injury or death, the Fifth Circuit has focused on a variety of relevant factors, including the prior hazardous activity of the vehicle, but it has found "proximity and temporal factors," i.e. the closeness of an officer to the projected path of a vehicle, to be particularly relevant.[141] And, as a result, when a law officer's actions are predicated on responding to what the officer perceives as a serious threat quickly and decisively, it is not unreasonable for an officer to use deadly force.[142] In this case, the Court finds no *material* dispute of fact relevant to this prong of *Graham*—namely whether, judging from Deputy Khars' perspective, under the totality of the circumstances, Schilly posed an immediate threat to the safety of Sergeant Marcal, who was positioned in the front corner of Schilly's vehicle as it began to roll forward.[143]

---

[137] R. Doc. 34-5 at 68.

[138] R. Doc. 34-5 at 75.

[139] R. Doc. 34-5 at 75.

[140] R. Doc. 34-5 at 76.

[141] *See Hathaway v. Bazany*, 507 F.3d 312, 321 (5th Cir. 2007).

[142] *Id.* at 322; *see also Jackson v. Gautreaux,* 3 F.4th 182, 187-88 (5th Cir. 2021); *Fraire v. City of Arlington*, 957 F.2d 1268, 1274-77 (5th Cir. 1992).

[143] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").

Because there is no dispute of material fact to counter Defendants' contention that Schilly "was going forward toward Sergeant Marcal," who was standing very close to Schilly's vehicle, and who was actually struck by her vehicle as a result of her movement, and because of the other undisputed facts in this case's record, including the video evidence of Schilly's actions at the initial scene, the Court finds no material issue of fact that would support the conclusion that Khars was unreasonable in his belief that Marcal was "about to receive great bodily harm or be killed by that vehicle."[144] The Fifth Circuit has explained that it is not even "relevant whether, in hindsight," an officer in Sergeant Marcal's position "was ever in real danger," but rather whether it would have appeared to a reasonable officer on the scene that a fellow officer or others were in danger.[145] The second *Graham* factor falls in Defendants' favor.

The third *Graham* factor is whether Schilly was actively resisting arrest or attempting to evade arrest. In the minutes leading up to her tragic death, Ms. Schilly had repeatedly refused law enforcement commands, had cursed at law enforcement officers, had sped off from the initial scene, striking Marcal with her vehicle in the process, and had just led the officers on a pursuit over multiple streets. And, in the final moments after coming to a stop because of traffic in her path, she again refused to listen to Sergeant Marcal's commands to "please stop," and had begun rolling forward like she had done moments earlier before speeding off and leading officers on a pursuit. Under these circumstances—in which Ms. Schilly had just fled the initial scene and led officers on a pursuit during which both officers had followed her with flashing police lights, while she had exceeded the posted speed, the Court finds no material issue of fact that would preclude a reasonable police officer from assuming Scilly was actively resisting arrest or attempting to evade arrest. Indeed, regardless of the "plan," i.e. whether to arrest her or bring her into protective

---

[144] R. Doc. 34-5 at 76.
[145] *Malbrough v. Stelly*, 814 F. App'x, 798, 805 (5th Cir. 2020).

custody as Khars understood the objective, or to get her out of the car to talk with her and understand what was going on with her, as Marcal understood the plan, Ms. Schilly, was, very tragically, and likely for reasons that will never be fully known, actively resisting the efforts of the officers. On this score, there is no material issue of fact. This *Graham* factor also falls in Defendants' favor.

Tasked with looking at all "relevant events coming before"[146] Khars shot and killed Schilly, the Court, judging the question of whether Khars' use of deadly force was justified from the perspective of a reasonable officer on the scene, taking due account of both the individual and governmental interests at stake,[147] finds no material issue of fact sufficient to overcome a finding that Khars' use of force, while tragic, was reasonable. Under applicable law, this question can only be answered by considering the "totality of the circumstances," after an analyzing court has "slosh[ed] its way through a factbound morass," paying "'careful attention to the facts and circumstances' relating to the incident, as then known to the officer."[148] Applying this standard to the facts of this tragic shooting, the Court finds that the use of deadly force on September 1, 2021, was reasonable. In reaching this conclusion, the Court has tried to identify the factual disputes, and to consider those facts in the light most favorable to the Plaintiffs, without weighing the evidence, but in this tragic case, there are no disputed issues of *material* fact, and this Court, therefore, must grant summary judgment in Defendants' favor on the excessive force claims.[149]

## 2. Officers Entitled to Qualified Immunity

---

[146] *Barnes v. Felix*, 605 U.S. 73, 83 (2025).
[147] *Id.* at 79.
[148] *Id.* at 80.
[149] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

Even if the Court had found, contrary to its conclusion above, that Khars violated Schilly's Fourth Amendment right, summary judgment would nonetheless be required on the individual claims against the officers because the officers' conduct was objectively reasonable in light of the clearly established legal rules at the time of this tragic shooting. Here, Plaintiffs cannot show a violation of a clearly established right of which a reasonable officer would have known when Schilly was shot.[150] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" from civil liability.[151] Even when an officer has a mistaken understanding of the law, he is shielded from liability if his actions are reasonable.[152] And, resolution of the question of whether qualified immunity is available in this case turns on whether, when Deputy Khars shot Ms. Shilly, a reasonable officer would have believed deadly force was unlawful when Schilly's vehicle began rolling toward Sergeant Marcal who was standing directly in front of Schilly's vehicle, *after* Khars had just observed Schilly's repeated failure to obey officers' commands, her flight from the initial scene, striking Marcal with her car at the initial scene, forcing the police pursuit that had just ended (or, for all Khars knew, was merely in a momentary pause).[153] Plaintiffs have failed to point to a single authority that would have informed Khars, beyond debate, that using lethal force during this tragic situation, when Schilly's vehicle was moving toward Marcal, was a violation of established law.[154] On the contrary, it is abundantly clear in the Fifth Circuit that when a law officer perceives an imminent danger of injury or death

---

[150] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
[151] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
[152] *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004).
[153] *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (explaining that the inquiry of whether something is a clearly established law should focus on whether the violative nature of particular conduct is clearly established in light of the specific context of a given case and not as a broad general proposition because it is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation confronting the officer).
[154] *Id.* at 13-14.

from a motorist who could use a motor vehicle as a weapon, it is permissible to use deadly force.[155]

Under the facts of this case, the Court finds that the doctrine of qualified immunity insulates these

officers from personal liability arising from the tragic death of Ms. Anne Schilly.

### B.  Failure to Intervene/Bystander Liability Claim

Plaintiffs loosely assert a "failure to intervene" claim, along with their excessive force

claim,[156] arguing that "Marcal had ample time to diffuse the weapon wielding Deputy Khars and

return him to the original plan."[157] A law enforcement officer can be held liable under § 1983 on

a theory of bystander liability if an officer knows a fellow officer is violating an individual's

constitutional rights, and has a reasonable opportunity to prevent the harm, but chooses not to

act.[158] It follows that an officer cannot be held liable on a theory of bystander liability if the third

party's actions that he failed to prevent do not, themselves, amount to a constitutional rights

violation.[159]

For the reasons discussed above, this Court has determined that Plaintiffs cannot show that

there was a violation of Ms. Schilly's Fourth Amendment right against unreasonable seizure. Thus,

Plaintiffs' failure to intervene claim against Marcal necessarily fails, and Marcal is entitled to

summary judgment as a matter of law.

Even if Plaintiffs had established a constitutional rights violation, Marcal would still be

entitled to summary judgment on Plaintiffs' failure to intervene claim because Plaintiffs have not

produced any evidence to show that Sergeant Marcal, who was dealing in real time with a fluid

and dynamic situation that was fraught with potential danger, was aware of any constitutional

---

[155] *See Jackson v. Gautreaux,* 3 F.4th 182, (5th Cir. 2021); *Davis v. Romer*, 600 F. App'x 926, 931 (5th Cir. 2015); *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007); *Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992).
[156] R. Doc. 1, ¶ 27.
[157] R. Doc. 38 at 17.
[158] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).
[159] *See Griffin v. City of Sugarland*, 787 F. App'x 244, 245 (5th Cir. 2019) (per curiam) ("[B]ecause there was no violation of his constitutional rights, [the plaintiff's] bystander liability theory also fails.").

violation based on Khars' drawing of his weapon, or that Marcal actually had any time to act in the extremely brief moment from when he heard Schilly's car, which he described as sounding like a racecar, to when he heard Khars' shots.

### C.  Claims Against Sheriff Lopinto in His Official Capacity

Plaintiffs' operative complaint maintains that the alleged wrongful conduct by Marcal and Khars occurred when they were in the scope of their employment as Sheriff Lopinto's agents, "rendering [Sheriff Lopinto] liable as principal for all torts committed by his agents."[160] A suit against a public servant in his official capacity is treated as a suit against a public entity,[161] and while a public entity can be held liable when an official policy or custom is the cause of a plaintiff's injuries, a public entity cannot be held liable under theories of *respondeat superior* or vicarious liability.[162]

In their opposition memorandum, Plaintiffs concede "[d]efendants are correct that there has been no evidence linking Sheriff Lopinto to the incidents in this case . . . [and] [t]here has been no evidence . . . as to any policy or practice that would establish liability [against Sheriff Lopinto] as a *Monell* claim."[163] Based on this, Plaintiffs concede "the court should grant the motion as to Plaintiffs' claims against Sheriff Lopinto."[164] After review, not only does the Court find that summary judgment is appropriate because the Plaintiffs have failed to put forth any evidence that Ms. Schilly's death arose from a constitutional violation that was caused by a violation of an official policy or custom of Sheriff Lopinto's department,[165] the Court also deems Plaintiffs'

---

[160] R. Doc. 1 at ¶¶ 29-30.
[161] *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).
[162] *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).
[163] R. Doc. 38 at 18.
[164] *Id.*
[165] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (explaining that a municipality cannot be held liable if its employee does not violate the Constitution).

official capacity claims against Sheriff Lopinto waived[166] and abandoned,[167] and the Court grants summary judgment as to all claims against Sheriff Lopinto.[168]

### D. State Law Claims

Relying on the same factual allegations that formed the basis of Plaintiffs' excessive force claims under federal law, Plaintiffs also brought claims under Louisiana state law, arguing that Schilly was the victim of a battery and of negligence that caused her death, entitling Plaintiffs to wrongful death and survival damages. Under Louisiana law, however, the standard of care owed by a policeman when approaching and interacting with a person like Ms. Schilly, under circumstances like those in the instant case, is one of "reasonableness under the totality of the circumstances."[169] Indeed, it is widely recognized that "excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances."[170] For all the reasons the Court has previously cited to support its finding that the officers in this case did not act unreasonably and, therefore, did not violate Schilly's constitutional rights, Plaintiffs' state law claims cannot survive Defendants' motion for summary judgment and must also be dismissed in their entirety.

---

[166] *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) ("[F]ailure to brief an argument in the district court waives that argument in that court.").

[167] *See Windsor v. Olson*, No. 3:16-CV-934-L, 2019 WL 2080021, at *9 (N.D. Tex. May 10, 2019) ("When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned.").

[168] *See Livingston v. Gaviolo*, No. 04-1303, 2006 WL 37029, at *3 (W.D. La. Jan. 5, 2006) (dismissing claim with prejudice after concession by party in opposition to summary judgment that it cannot maintain the claim).

[169] *See Mathieu v. Imperial Toy Corp.*, 646 So. 2d 318, 322 (La. 1994) (quoting *Kyle v. City of New Orleans*, 353 So. 2d 969, 973 (La. 1977)).

[170] *Shepherd ex rel Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (collecting cases).

V.    **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (R. Doc. 34) is **GRANTED**, and Plaintiffs' claims against all Defendants are dismissed with prejudice.

New Orleans, Louisiana, this 15th day of December 2025.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**